E-FILED
Friday, 17 June, 2016  09:57:59 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

|  |  |  |
|---|---|---|
| BETHANY DARLENE LITTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-3100 |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Following the denial of her application for supplemental security income benefits, Bethany Darlene Little filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

Pending before the Court are her Motion for Summary Judgment and the Commissioner's Motion for Summary Affirmance.

## I. INTRODUCTION

On May 7, 2010, the Plaintiff filed an application for supplemental security benefits which was denied initially and also upon reconsideration.

The Plaintiff requested an administrative hearing.

On September 16, 2011, a hearing was held before Administrative Law Judge ("ALJ") Shreese M. Wilson.  On November 30, 2011, the ALJ found the Plaintiff not disabled.  The Appeals Council denied the Plaintiff's request for review on February 14, 2013, and this action followed.

The Plaintiff was born in 1964 and was 45 years old at the time of her alleged onset date.  She has an eleventh grade education.  The Plaintiff's past relevant work was as a housekeeping cleaner and bagger.  The ALJ concluded that Plaintiff cannot perform any of her past relevant work.

## II. FACTUAL BACKGROUND

A. Medical evidence

(1) Graham Hospital

X-rays of the Plaintiff's lumbar spine dated February 7, 2010 revealed findings consistent with mild lumbar spondylosis.  A lumbar spine MRI dated February 22, 2010 revealed a moderately large left posterolateral disc extrusion at L3-L4 compressing the thecal sac as well as the left L4 nerve root.

(2) Patrick Renick, M.D.–Treating Family Practitioner

Dr. Renick is board certified in family medicine.  In a letter dated August 26, 2010, Dr. Renick wrote that Plaintiff suffered from herniated discs at L3-L4 and L4-L5 which resulted in compression of the L4 nerve root.  He noted that without surgical correction–which the Plaintiff could not afford–her pain and disability would likely continue for at least one year.

On August 26, 2010, the Plaintiff reported leg pain related to a herniated disc.  She received some relief with Neurontin.  The Plaintiff noted recent migraines, hypertension and hypothyroidism.  The doctor's physical examination revealed pain on extension of the back and a positive straight-leg raising test on the left.  Dr. Renick diagnosed a left-sided lumbar disc herniation, migraines, hypertension and hypothyroidism and prescribed Flexeril for her symptoms.

Following the examination on August 26, 2010, Dr. Renick diagnosed the Plaintiff with a disc herniation and radiculopathy.  His clinical findings included left leg pain and the MRI showed findings consistent with disc

herniation.  The Plaintiff's primary symptoms included lower back pain that radiated into the leg and worsened with movement.  Dr. Renick found the symptoms and limitations had been present since June of 2009.

Dr. Renick opined that Plaintiff was limited to sitting for up to two hours total, standing/walking for up to one hour total and occasionally lifting up to five pounds during an eight-hour workday.  She had significant limitations in doing repetitive reaching, handling, fingering or lifting due to an exacerbation of pain with lifting or overhead activity.  The doctor noted moderate bilateral limitations in using the arms for reaching.  The Plaintiff was referred to neurosurgery but could not pursue treatment as she lacked insurance.  Dr. Renick found that Plaintiff would likely be absent from work more than three times per month because of her impairments.  He found she was unable to push, pull, kneel, bend and stoop on a sustained basis.

On September 29, 2010, Dr. Renick observed that Plaintiff's symptoms were not relieved with medication management and therapeutic exercises.  He noted the results of the February MRI and again observed

4

she would be disabled indefinitely without neurosurgical intervention.  The Plaintiff reported on September 30, 2010 that Flexeril was not helpful and only put her to sleep.  Dr. Renick prescribed Ultram and continued her prescription for Neurontin.

On December 17, 2010, Dr. Renick completed a second Multiple Impairment Questionnaire and diagnosed the Plaintiff with herniated disc syndrome.  His clinical findings included left low back pain with radiation into the leg and he noted an MRI that showed a lesion at the appropriate nerve root to explain the Plaintiff's symptoms.  The Plaintiff's primary symptoms included only daily pain in the low back that radiated into the left leg and worsened with sitting or standing.  The doctor concluded that the symptoms and limitations described in the questionnaire had been present since October 15, 2009.

Dr. Renick was of the opinion that Plaintiff was limited to sitting for up to one hour total, standing/walking for up to one hour total and occasionally lifting up to five pounds during an eight-hour workday.  He believed her symptoms were severe enough to constantly interfere with

attention and concentration and he further noted that she suffered from depression at times.  The doctor found that Plaintiff would likely be absent from work more than three times per month because of her impairments. He precluded her from pushing, pulling, kneeling, bending and stooping on a sustained basis.

On January 13, 2011, the Plaintiff reported that she was falling out of bed while sleeping but otherwise doing well.  Dr. Renick diagnosed morbid obesity and renewed the Plaintiff's prescription for Neurontin.  On March 31, 2011, the Plaintiff advised she had recently been hospitalized for five days due to depression and placed on Prozac.  The Plaintiff also reported neck pain radiating into the arm.  Dr. Renick advised her to continue counseling and he placed her back on Flexeril for the neck pain.

On April 28, 2011, the Plaintiff returned with left arm numbness over the previous month that worsened with overhead activity and was associated with tingling.  Dr. Renick diagnosed her with paresthesias and prescribed Prednisone.  On May 26, 2011, the doctor noted that Plaintiff's paresthesias were short-lived and not a serious problem.  On June 23, 2011,

the Plaintiff reported feeling "pretty good" but still suffered from leg pain. Her depression was improved with Prozac.  Dr. Renick diagnosed her with chronic lower back pain and stable depression.  On July 28, 2011, the Plaintiff presented with pain in both knees and back spasms with pain radiating down the legs.  She declined a muscle relaxer.  Dr. Renick advised her to perform extension exercises.

(3) Daniel Fassett, M.D.–Examining Neurosurgeon

On April 1, 2010, the Plaintiff presented to Dr. Fassett, a board certified neurosurgeon, for a neurosurgery consultation.  She reported severe pain radiating down her left leg over the previous four months with numbness, tingling and difficulty walking.  Her treatment consisted only of Neurontin.

Dr. Fassett's physical examination noted the Plaintiff was 5'3'' and weighed 218 pounds.  He found her strength was full but difficult to assess due to pain in the left lower extremity.  Dr. Fassett noted compression of the L4 nerve root by the recent MRI.  The doctor advised the Plaintiff to pursue conservative options before considering surgery.

### (4) Methodist Medical Center of Illinois

On March 11, 2011, the Plaintiff was admitted to Methodist Medical Center of Illinois with depression and suicidal ideation. She reported calling the sheriff's department because she wanted to overdose on her medications. The Plaintiff expressed increasing depression due to her financial situation. Upon admission, she began attending therapy sessions and was started on Prozac as well. The Plaintiff's condition improved and on March 16, 2011, she was discharged with a diagnosis of depression, not otherwise specified, and her GAF was rated at 60.[1] She was advised to continue psychotherapy sessions at the Canton Health and Wellness Center.

### B. Plaintiff Bethany Little's testimony

The Plaintiff testified that she suffered a slip-and-fall on October 1, 2009 and was unable to work as a result. She suffers from constant left-

---

[1] A GAF (Global Assessment of Functioning) score of 51-60 denotes moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. Text Revision ("DSM-IV"), p.34. However, the newly released Diagnostic and Statistical Manual of Mental Disorders 5th Ed., 2013 ("DSM-V") no longer uses GAF scores as a diagnostic tool for assessing a patient's functioning.

side pain from her lower back down into the left foot.  The Plaintiff experiences tingling in the left leg from the hip down to the ankle.  Her pain worsens with sitting for more than thirty minutes and with prolonged standing.  The Plaintiff testified she can stand for fifteen minutes at a time before having to sit down.  She uses a walker when standing.  The Plaintiff can lift up to a gallon of milk.

The Plaintiff testified she experiences one to three "bad days" per month wherein she spends most of the day in bed.  The Plaintiff could not afford surgery or spinal injections.  She began using a walker on a daily basis in November of 2009 until she was placed on Neurontin.  The Plaintiff then used the walker occasionally at the grocery store.  When she ran out of her medication, the Plaintiff would go back to using the walker on a daily basis.  She had migraines once a month.

The Plaintiff reported a five-day hospital stay because she "just snapped."  She was placed on medication but could not get therapy because she could not afford transportation.

The Plaintiff testified that she watches television and does word

puzzles during the day. She has to change positions frequently and moves from chair to chair in her home, elevating her leg. The Plaintiff does not do any cooking and gets help with grocery shopping. She gets help with dressing approximately twice weekly and has help showering. The Plaintiff also has help taking care of her dog. She visits with friends, plays cards and enjoys karaoke.

C. Vocational expert's testimony

The vocational expert testified that an individual of the Plaintiff's age, education and work history who was limited to lifting and carrying up to twenty pounds occasionally and ten pounds frequently; sitting, standing, or walking up to six hours each during an eight-hour workday; no climbing ladders, ropes or scaffolds; occasionally climbing ramps or stairs; and occasionally stooping, kneeling, crouching, or crawling could perform her past relevant work as a housekeeper and cashier.

The vocational expert testified that an individual with the same limitations except for standing and walking for a total of only two hours per eight-hour workday would be unable to perform the Plaintiff's past relevant

work.  Such an individual would be able to perform work as a circuit board screener, assembler, document preparer and order clerk.  An individual with these limitations who would need to alternate sitting and standing at least one time per hour and remain in the alternate position for about five minutes would still be able to perform the identified jobs.

The vocational expert testified that an individual who also could not perform jobs involving "production requirements" would be unable to work. Additionally, an individual limited to sitting for six hours and standing for two hours during an eight-hour workday, lifting up to ten pounds occasionally, a sit/stand option at will and who needed to hold on to a walker with both hands while standing would be unable to work.

D. Decision of the ALJ

In a decision dated November 30, 2011, ALJ Wilson found that Plaintiff had severe impairments of degenerative disc disease, obesity and depression, but retained the residual functional capacity to perform light work except that she could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally stoop, kneel, crouch and

crawl; stand and walk no more than two hours total; a sit/stand option once per hour for five minutes; and, was limited to unskilled work.  Given this residual functional capacity, the ALJ found that Plaintiff could not perform any of her past relevant work.

The ALJ did find that Plaintiff could perform other work as a circuit board screener, eyewear assembler and document preparer.

The Plaintiff contends that the ALJ erred in failing to follow the Treating Physician Rule and also in relying on flawed vocational expert testimony.

The Defendant alleges the ALJ's residual functional capacity was supported by substantial evidence.  Moreover, the ALJ reasonably rejected Dr. Renick's opinions.  The Defendant further contends that substantial evidence supports the ALJ's assessment of the vocational expert's testimony.

## III. DISCUSSION

### A. Standard of review

When, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner.  See Schaaf v. Astrue, 602

F.3d 869, 874 (7th Cir. 2010).  The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Yurt v. Colvin,* 758 F.3d 850, 856 (7th Cir. 2014) (citations omitted).  Although the Court's task is not to re-weigh evidence or substitute its judgment for that of the ALJ, the ALJ's decision "must provide enough discussion for [the Court] to afford [the Plaintiff] meaningful judicial review and assess the validity of the agency's ultimate conclusion."  *Id.* at 856-57.

B. Evaluation of disability

The ALJ found that Plaintiff had not engaged in substantial gainful activity after her onset date and had severe impairments which included degenerative disc disease, obesity and depression.  At step three, however, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

13

The ALJ found that Plaintiff had the residual functional capacity to perform light work[2] as defined in 20 C.F.R. § 416.967(b), except that she could never climb ladders, ropes or scaffolds; could only occasionally climb ramps or stairs, stoop, kneel, crouch or crawl; could stand or walk no more than two total hours and had to alternate between sitting and standing one time per hour for five minutes; and could only perform unskilled work.  The ALJ found that although the Plaintiff could not perform her past work, she could perform other work in the national economy.

(1) Plaintiff's alleged failure to comply with procedures

The Commissioner notes that Plaintiff refused to cooperate with the agency's procedures for gathering objective, reliable evidence concerning her functionality.   The  Plaintiff  did  not  attend  her  scheduled  physical

---

[2]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 416.967(b).

14

consultative examination. The Commissioner states the record shows that Plaintiff later said she would attend an exam if it was scheduled in Peoria. However, when the agency accommodated her request and scheduled an exam in Peoria–and explained to her the consequences of failure to attend–the Plaintiff still did not attend or call to cancel her exam. The Plaintiff behaved similarly with respect to her psychological consultative exam–she refused to attend an initial exam that was scheduled and failed to respond to subsequent call-in cards sent to her and a third party.

As the Commissioner states, the Plaintiff's failure to comply with agency procedures would have been grounds to deny her claim. *See* 20 C.F.R. § 416.918(a) ("If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability . . . we may find that you are not disabled.").

Although the ALJ makes reference to the Plaintiff's "non-cooperation," which "has precluded the agency from developing objective and unbiased medical information and opinions regarding her impairment,"

15

*see* R. at 30, the Plaintiff's claim was not denied due to her failure to cooperate, even though it could have been under § 416.981(a). Accordingly, the Court cannot uphold the ALJ's decision on that basis. *See Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010).

(2) Treating physician rule

"A treating physician's opinion that is consistent with the record is generally entitled to controlling weight." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). An ALJ who rejects a treating physician's opinion "must provide a sound explanation" in support of the rejection. *See id.* If the treating physician's opinion is internally inconsistent or inconsistent with other medical evidence in the record, the ALJ may reject that medical opinion if she "minimally articulates [her] reasons for crediting or rejecting evidence of disability." *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (citation omitted).

Although infrequent treatment or the failure to follow a treatment plan can support an adverse credibility finding if the claimant does not have

16

a good reason, "the ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (internal quotation marks omitted) (citing SSR 96-7p). An ALJ should not draw a negative inference regarding a claimant's credibility from her lack of medical care or medical noncompliance without first inquiring about why she did not receive treatment. *See id*; *see also Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (noting that ALJ's must consider a claimant's explanation for failing to keep up with her treatment and an inability to pay for medication may excuse the failure to pursue treatment under SSR 96-7p).

Because the ultimate opinion as to disability is reserved to the Commissioner, *see Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010), the ALJ was entitled to discount Dr. Renick's conclusion that Plaintiff was disabled.

Dr. Renick stated that in the absence of surgery, the Plaintiff would remain disabled for at least one year. The ALJ stated that although she

considered the opinion of Dr. Renick, his statements are not supported by objective medical findings.

The ALJ stated that while an MRI showed disc herniation with nerve root compression, Dr. Renick did not cite any objective findings which supported the conclusion that Plaintiff has debilitating pain. There was no evidence that Plaintiff had difficulty ambulating, limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensation loss or reflex abnormalities.

The ALJ also found that Dr. Renick's letter appeared to contain inconsistencies and was thus less persuasive. Although the doctor noted that medication management had provided the Plaintiff no relief and she was denied surgery due to her financial situation, the Plaintiff stated that medication such as Neurontin and over the counter pain medication provided some relief. The Plaintiff testified that Flexeril did little other than make her tired. However, Neurontin "works pretty good." R. 59. The Plaintiff was able to walk without the aid of a walker every day when taking Neurontin. At the time of the hearing before the ALJ, the Plaintiff

18

was out of her medication and said she was using the walker every day.

Dr. Fassett recommended that Plaintiff undergo conservative therapy before pursuing surgical options.   Dr. Fassett, a neurosurgeon, recommended against neurosurgery due to the Plaintiff's weight.  In April of 2010, he recommended a conservative course of treatment which included an epidural steroid injection.  If the pain were to persist, Dr. Fassett stated that surgery might then be considered.  Although the ALJ observes that the record does not show whether the Plaintiff underwent the recommended steroid injections, it would appear that she did not.  When asked about the epidural injection as a course of treatment the Plaintiff testified, "But I don't have the insurance and nobody will help me.  I can't get any help with that."  R. 58.

Dr. Renick noted multiple times in August, September and October of 2010 that Plaintiff was denied surgery due to her financial situation.  The Commissioner states that Plaintiff's financial situation had nothing to do with the fact that she did not undergo neurosurgery.

The Plaintiff testified that the neurosurgeon informed her that surgery

was a 50/50 proposition.  It may or may not help.  The Plaintiff testified that the neurosurgeon left the decision up to her.  The Plaintiff stated she contacted the hospital and was asked about her husband's income, even though she had not seen her husband in twelve years.  She testified she could not get any help because she did not have information about her husband's income.  Accordingly, the Plaintiff testified she could not afford the surgery if she elected to have the procedure.

Given the invasive nature of the surgery, however, the Plaintiff testified she was not certain she would have decided to go through with the procedure even if she had the financial means.

The ALJ also noted that Dr. Renick is a family practice physician, not a neurologist, and some of his conclusions seem to rely on his assessment of an impairment outside his area of expertise.  Pursuant to 20 C.F.R. §§ 404.1527 and 416.927 and SSR 96-5p, the ALJ did not give controlling weight to Dr. Renick's conclusions that did not have corresponding medical findings.  The ALJ stated that more weight was given to objective medical findings and the reasonable limitations that could be deduced therefrom.

The ALJ also observed that Dr. Renick completed two Multiple Impairment Questionnaires wherein various restrictions were observed as to the Plaintiff's ability to work.  For example, in one questionnaire, the doctor observed that Plaintiff could sit for two hours and do minimal grasping; in the other, he opines that Plaintiff could sit for one hour and had no limitations as to grasping.  The ALJ states that nothing in the record or Dr. Renick's notes reveal any long term exacerbation, degeneration or new injury that might explain the contradicting restrictions.  Moreover, Dr. Renick does not note any restrictions regarding the Plaintiff's activities in his treatment notes.  These questionnaires were given little, if any, weight by the ALJ as inconsistent with the record and each other.

The Defendant contends that because Dr. Renick's extreme opinion was not reflected in the treatment notes, it is not well-supported.  Although Dr. Renick's opinion that Plaintiff could sit for no more than one hour per day was particularly extreme, that restriction is not memorialized in his ongoing treatment notes.

The Plaintiff alleges that the ALJ's conclusory finding that Dr.

21

Renick's opinions are inconsistent with the "overall record" is insufficient to permit meaningful review. Moreover, the inconsistencies identified by the ALJ are so de minimis as to be meaningless when the limitations are disabling, given that none of Dr. Renick's assessments are consistent with even sedentary work, which requires sitting at least six hours a day.

Additionally, the ALJ's finding that it was significant Dr. Renick did not record the specific limitations found for the Plaintiff in her treatment records is misplaced because medical charts are not kept in anticipation of litigation. The Plaintiff contends the doctor's opinions are supported with appropriate medical findings. Dr. Renick noted that Plaintiff's assessed limitations were based on evidence of left low back pain that radiated to the left leg and was worsened with movement, as well as MRI findings consistent with disc herniation.

The Defendant alleges that Dr. Renick's opinions did not address the objective evidence of record that he observed her to have normal and full motion and strength.

Because she alleges the ALJ failed to cite to any evidence that

22

contradicted the limitations or medical findings described by Dr. Renick, the Plaintiff claims the treating physician's opinions must be given controlling weight under 20 C.F.R. § 416.927(c)(2).

The Plaintiff contends that, at the very least, the ALJ was required to weigh the opinions from Dr. Renick under the enumerated factors in 20 C.F.R. § 416.927(c)(2)-(6).  Moreover, the factors listed in SSR 96-2p support crediting the doctor's opinion.  Dr. Renick treated the Plaintiff regularly throughout the applicable period.  The treatment focused on the Plaintiff's disabling musculoskeletal impairments.  Additionally, Dr. Renick provided specific medical findings to support his opinions.  The Plaintiff further asserts that the evidence cited by the treating physician as supporting his findings is borne out by the longitudinal treatment record.  Accordingly, the ALJ had no basis to ignore these findings.

The Plaintiff contends that the ALJ failed to appropriately weigh Dr. Renick's opinions in determining that Plaintiff could perform a range of light work.  In making this finding, the ALJ did not comply with SSR 96-8p (1996 WL 374184), which provides:

23

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted).

The Plaintiff asserts that the ALJ did not cite specific medical facts or nonmedical evidence that is consistent with a finding that Plaintiff could perform light exertional work.  Because the ALJ simply listed the Plaintiff's severe impairments and concluded they are consistent with light work activity, the Plaintiff contends the finding as to residual functional capacity is not supported by substantial evidence.

## IV. CONCLUSION

Upon reviewing the entire record, the Court is unable to conclude that the ALJ's decision is supported by substantial evidence.  There are a

number of gaps in the record.  The ALJ did not consider the apparent inability of the Plaintiff to follow the more conservative course recommended by Dr. Fassett–that being an epidural injection–due to the Plaintiff's lack of insurance and inability to afford the treatment.  This course of treatment was recommended in April of 2010.  The Court declines to speculate on whether Dr. Fassett's recommended course would have alleviated the need for surgery, as recommended by Dr. Renick in August of 2010.  Although the Plaintiff testified she is uncertain she would have elected to have surgery, she could not get approval from her insurance company because she lacked financial information pertaining to her husband, who apparently was no longer in her life.

The Court agrees with the Commissioner that there do appear to be some inconsistencies and other issues with Dr. Renick's opinions and conclusions.  However, there is very little medical evidence in the record and nothing that is entirely inconsistent with his opinions.  While this may be due to the Plaintiff's failure to cooperate with the agency in developing the record, the Court cannot use that as a basis to reject her claim.

25

Despite the problems with Dr. Renick's opinions, identified by the Commissioner, the ALJ did not point to any evidence that contradicted the limitations or medical findings. Accordingly, although the doctor's opinion may be flawed, it stands uncontradicted on the record before the Court.

<u>Ergo</u>, the Plaintiff's Motion for Summary Judgment [d/e 6] is ALLOWED.

The Defendant's Motion for Summary Judgment [d/e 10] is DENIED.

The Commissioner's Decision is Reversed and the action is Remanded for a new decision.

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Clerk shall enter a Judgment. This case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion.

ENTER: June 16, 2016

    FOR THE COURT:

*s/Richard Mills*
Richard Mills
United States District Judge
